## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ) | Case No. 3:18-mj-00382 |
| ) | |
| Apple iPhone, IMEI 359305064431893 ) | **UNDER SEAL** |
| And Seagate Hard Drive S/N W765SX82, ) | |
| both currently located at the McLaughlin ) | |
| Youth Center, Anchorage, Alaska ) | |
| ) | |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION

## UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Daryl Allison, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.        I make this affidavit in support of an application under Rule 41 of the

Federal Rules of Criminal Procedure for a warrant to search the person of Dennis

Henry Weston, the premises known as 13431 Baywind Drive, Alaska (hereinafter

"SUBJECT PREMISES"), and any person located at the SUBJECT PREMISES,

both further described in Attachment A, for the things described in Attachment B.

2.        I am a Special Agent (SA) with the Federal Bureau of Investigation

(FBI), and have been since October 2003.  In this assignment I have investigated a

number of violations of United States Code.  For the past several years, I have

investigated crimes against children including but not limited to internet crimes

against children, online enticement of children, child pornography possession and

distribution.  I have conducted and participated in search warrants, arrest

warrants, and interviews of people involved in crimes against children. I have also attended trainings specific to the use of computers in the commission of crimes against children.

3. I have attended the following computer based training with an emphasis in online investigations involving the sex trafficking of minors: Innocent Images Online Basic Training Program; Violent Crimes Against Children Forensic Interviewing.

4. This affidavit is made in support of an application for a warrant to search the person of Dennis Henry Weston and the entire SUBJECT PREMISES, which are more particularly described in Attachment A, inclusive of the mobile devices, and to seize the items specified in Attachment B, which constitute instrumentalities, fruits, contraband, and evidence of violations, or attempted violations, of 18 U.S.C. §§ 2422, attempted coercion and enticement of a minor.

5. I am familiar with the information contained in this affidavit based upon the investigation I have conducted, which included conversations with law enforcement officers and others and review of reports and database records.

6. Because I submit this affidavit for the limited purpose of securing a search warrant, I have not included each and every fact known to me or the government. I have only included those facts necessary to establish probable cause to believe that evidence of violations, or attempted violations, of 18 U.S.C. §§ 2422 are located on the person of Dennis Henry Weston and/or at the SUBJECT PREMISES.

7.     This affidavit is made in support of an application for a warrant to search the person Dennis Henry Weston (date of birth May 19, 1964) and his residence located at 13431 Baywind Drive, Anchorage, Alaska, which are more particularly described in Attachment A, and to seize the items specified in Attachment B, which constitute instrumentalities, fruits, contraband, and evidence of violations, or attempted violations, of 18 U.S.C. § 2242(b), attempted coercion and enticement of a minor.

8.     I am familiar with the information contained in this affidavit based upon the investigation I have conducted, which included conversations with law enforcement officers and others and review of reports and database records.

9.     Because I submit this affidavit for the limited purpose of securing a search warrant, I have not included each and every fact known to me or the government.  I have only included those facts necessary to establish probable cause to believe that evidence of violations, or attempted violations, of 18 U.S.C. §§ 2242(b) are located on the person of Dennis Henry Weston and/or in the SUBJECT PREMISES.

## **BACKGROUND OF THE INVESTIGATION**

10.   On April 24, 2017 and undercover FBI employee (UCE) posted an ad in the personals section of the Craigslist.com web site.  The title of the ad was "Daughter just arrived in town – w4m (Wasilla)."  The body of the ad read as follows:

> Just awarded custody of my 10yo daughter from down south. She is quite a handful and needs to gets some energy out. If you think you can handle her she needs a babysitter. We can work out the terms later.

11.    The UCE received numerous responses to the ad by email that same day. The UCE replied to all of the emails and sent the phone number of an undercover cell phone to a number of the email addresses, the users of which expressed an interest in continuing to converse about the UCE's ten year old daughter.

12.    That same day an individual using the phone number 907-723-1334, hereinafter "the SUBJECT," sent a text message to the UCE. The UCE was not able to determine which email address the individual had been using to initiate communication with the UCE.

13.    During the initial conversation the SUBJECT discussed with the UCE the UCE's "childcare" situation.   During this conversation the SUBJECT asked the UCE "Would we be watching her together or on my own?" to which the UCE replied "Together." The UCE asked the SUBJECT if he/she had done any babysitting before, to which SUBJECT replied "Yes." SUBJECT asked how old the UCE's daughter was, to which the UCE replied "10yo." SUBJECT then asked "And your interested in helping with her supervision?" to which the UCE replied "Yes definitely."

14.    The UCE continued an intermittent conversation over text message with the SUBJECT through June of 2018.

15.    On April 26, 2017 the SUBJECT asked the UCE "Won't bother you with endless texts if someone has been found to help you out with Becky but if your still looking I am open to the next step." The text message was signed "John."

16.     The UCE responded on April 26, 2017 and told the SUBJECT that he was still looking and asked the SUBJECT "You done this before?" The SUBJECT responded "Understand and **yes watched over young girls before**." The UCE told the SUBJECT "…we have played a little but I'm not sure the best way to go about some things." The SUBJECT responded "What play activities are you unsure about?  Bedtime, bath time, games????" The following conversation then occurred. The SUBJECT's questions/responses are on the left in grey and the UCE's are on the right in blue.

> Just don't ant to hurt her

Course not, what's the confusing part?

> Not sure we are on the same page

I know the page I am on...

> Me too.  I guess I just need to say it.

Ok no judgement here

> We haven't been able to do full pen yet

She likes to play?

> Seems to. Just not as far as that yet. Uncomfortable for her

Ok so why the CL add?

> Think I might like to watch

Ok

Your call on that...

> Definitely want to be there

Absolutely

Based on my training and experience "full pen" is often used to refer to full penetration sexual activity. The UCE then asked the SUBJECT "Have you done this before?" to which the SUBJECT replied "Not unfamiliar territory." Shortly thereafter the SUBJECT stated "…Gotta go for now….bye."

17. On April 27, 2017 the UCE reinitiated contact with the SUBJECT and asked "You still interested in meeting?" The SUBJECT responded "No interest in the least."

18. On April 28, 2017 the SUBJECT reinitiated contact and stated

> Sorry about that, significant other found my phone charging and "assumed" some woman was trying to meet up.
>
> Gotta let be the jealousy.
>
> Get back when you can

19. On April 28, 2017 the UCE reinitiated contact with the SUBJECT. During the conversation the SUBJECT asked:

> You know of any good adult websites that actor to our interests?

20. On May 3, 2017 the UCE reinitiated contact and asked the SUBJECT if he wanted to meet that week. The SUBJECT and UCE briefly discussed logistics of meeting, after which the SUBJECT asked:

Do you do her laundry?

Usually. Trying to teach her to do her own.

You will know she is ready to play by checking out her panty liners

When doing her laundry

What do you mean? She seem to like it now.

She needs to be wet to enjoy playing and that wetness will stain her panties when she is ready

The conversation was terminated shortly thereafter.

21. On May 7, 2017 the SUBJECT initiated contact with the UCE and the following conversation ensued:

Sunday 3:30 PM

Hey

Sunday 6:30 PM

Hey. Been away from the phone today.

Back from Nome?

Sunday 8:05 PM

Actually no and it appears that I will be based out on the bush for the summer.

Going to take a break from the "fantasy babysitter" and wanted to let you know in advance as most places in bush AK don't have AT&T, just GCI. Give ya one guess which carrier I use.

Cheers

John

22. On May 14, 2017 the SUBJECT reinitiated contact with the UCE:

Sun, May 14, 7:02 AM

Back in town for a few days and plan to be in the valley next week.

The UCE did not see the message and did not respond until the following week.

23. On May 20, 2017 the UCE responded to the SUBJECT's previous message. The UCE and the SUBJECT briefly discussed meeting the following week.

24. On May 24, 2017 the SUBJECT reinitiated contact and asked the UCE to describe his daughter's body. The UCE and SUBJECT briefly discussed meeting and the SUBJECT bringing a gift for the UCE's daughter. The UCE suggested an age appropriate toy. The SUBJECT replied:

> Although they don't always know it, vibrating massagers and pulsating shower nozzles are great gifts

>> I guess you would have to show her how to use them

> Is she matured enough for that?

>> You suggested it, I thought maybe you knew.

> Would need to see her nips and slit to know

25. The following discussion then took place:

Is this "fantasy" for you of do you want to play?

Inside ring it started with a CL add and the subsequent subject matter was very risky I was always thinking fantasy.

Guessing now you are looking to play

Was always looking to play. Thought you were too.

Understand

Think about the possibilities daily

Me too.

Did you plan for me to simply come to your home and meet Becky?

Just asking as that's not how it works.

No. Don't really know you except through text so would maybe meet at hotel or something.

Secrecy and maintaining privacy is the key given the risks

This is first time I have tried to meet someone so I don't know how it works.

In reality none can be able to identify the others.

That's why I suggested a hotel

Can Becky be trusted?

I think so. I have told her that she would have to go back to her mother if anyone found out. Her mother uses.

In this social media day and age it's practically impossible to keep anything private.

School and doctors offices are asking probing question as well.

26. The conversation between the UCE and the SUBJECT continued intermittently until August 16, 2017 at which time the SUBJECT asked.

Down in Arizona this week, back next week.
Are you in Anch next week?

The UCE responded on August 18, 2017:

I will be around next week. What do you have in mind?

Hoping to meet up and make plans

I will LAN to be in Palmer next week also if that works better for you

Any stained panties yet?

Yes. Really started looking after you pointed that out.

How is beckys chest developing?

What 's her favorite activity when you guys play doctor????

Starting to see some development in her chest

Her nipples should be getting sensitive. Does she like having them touched?

They are a little sensitive but she is ok with them being touched after we get warmed up a little

Her pubic hair will start to grow in her slit first and that's when she will start to stain her panty liner heavy everyday.

That's a great time to play and explore. She will be curious and excited because everything feels good

**The SUBJECT then asked for a picture of the UCE's daughter.** The

SUBJECT then continued:

And her little cunt hair will get more course and dark in the mouths ahead

Fully dressed is fine

Do you prefer hair or not

I prefer slit hair at the early stage because the clit and cunt hole are usually drenched with creamy discharge in preparation for sex play and the monthly period that starts a bit later

Based on the SUBJECT's request for a photo, the UCE sent an age regressed photo of another FBI agent by text message. The conversation then continued:

Very nice

She looks great

Do you want to see for yourself ?

Yes

Looking at her picture I am thinking her panties would be heavily stained every morning with creamy juice

She needs a sitter when your busy, right?

27. The UCE and SUBJECT continued to discuss meeting. The UCE asked the SUBJECT:

Are you really up for it. Seems like we have been talking about it for a while but hasn't happened. Don't want to get too excited about it if you really aren't into it

Into it ? Yes. That said it's risky behavior for everyone and that can be a damper on the excitement

Yes I understand. If you don't want to that's cool just let me know so I can look for someone else.

> Back now,
>
> Meeting Becky would be fun if done right and made her feel comfortable.
>
> Meeting a complete stranger in a hotel room would be frightening for any girl and not end well for anyone.

The subject then proposed a plan to meet the UCE and his daughter at a public pool where the SUBJECT could initiate sexual contact with the UCE's daughter while playing with her in the pool. Later in the discussion the SUBJECT asked:

> Sure you have seen some porn where young girls have been sexually educated through the use of gloryhole or play doctor sessions.
>
> Sound like something Becky would like at some point?
>
> First time getting titties licked, cunt fingered, first taste of cum, first cock.
>
> It's all on the menu when the time is right?

28. On September 5, 2017 an FBI UCE conducted a recorded phone call with an individual using the SUBJECT phone number. The SUBJECT asked how the

UCE's daughter was doing. The UCE and the subject discussed meeting at a public pool. The SUBJECT then asked "What is her interest? I mean if she has no interest it's all for nothing. No interest in, you know, playing or being naked." The UCE told the SUBJECT that he had been sexually active with his daughter. The SUBJECT asked "How far have you been able to take this with her?" The UCE described sexual activity with his daughter. The SUBJECT then asked if the UCE was concerned that his daughter might tell someone about their activity. The UCE stated that he was not concerned. Later in the conversation the SUBJECT asked "Is she able to get wet yet?" He then stated "When she starts staining her panties...her cunt is getting ready to, you know, be active." Later in the conversation the UCE asked the SUBJECT what he wanted to do with the UCE's daughter. The SUBJECT replied "There's usually, you know, licking and sucking, exploration before anybody is, uh, screwing anybody else." The SUBJECT stated to the UCE "I've got another person who is dying to meet her too, but I haven't said anything about her to him. But usually this is down the road a ways." The UCE expressed his desire to move slowly. The SUBJECT replied "This takes months." "And I'll tell you what, kind of, his fantasy is, and see where this fits in your long term plans. His fantasy is basically for, uh, for him, his fantasy is to kind of rub his cock up and down her slit until he erupts all over it...he wants to completely cover her slit with his juice and then um hopefully she can either feel good and orgasm too and have me down there either cleaning it up or helping out." The UCE then asked the SUBJECT if he was serious about

meeting. The SUBJECT and UCE then discussed the possible repercussions of the activities discussed.

29. Approximately two hours after the call terminated, the SUBJECT sent the following text message:

Tue, Sep 5, 7:50 PM

> Interesting chat. anyway you did ask when this fantasy would turn reality and the answer for me is never.
>
> After a few minutes thinking about things it seems the News is full of scandals and heartbreak when these things go bad, and they always go bad one way or the other, so I want no part of it, now or ever.
>
> Consider this my final word on the matter and let's part ways on that note so you can look elsewhere for your fun

The UCE then sent a message to the SUBJECT asking if the subject's girlfriend had found his phone again.

30. The UCE sent the following message on October 23, 2017.

Mon, Oct 23, 12:20 PM

> Still around if you changed your mind

31.   After receiving no other contemporaneous messages from the SUBJECT, the UCE stopped checking the undercover phone for messages.  The phone was left on and the battery was completely drained.

32.   On November 21, 2017, the phone was charged and checked by the UCE, who found the following messages on the phone.

Mon, Oct 30, 7:44 PM

Jason,

Been in trip up north. Got your message and realized I had sent a couple text to wrong number.

How is Becky?

Tue, Oct 31, 10:47 AM

Let me know a good time to call you

Mon, Nov 20, 3:56 PM

Hey, this still Jason's contact number?  If not sorry and disregard

John

No response so probably got the number right but lost the connection with Jason and Becky.

Hope to hear back at some point down the road.

John

33.   The UCE expressed to the SUBJECT that the UCE did not expect to hear from the SUBJECT again.  The SUBJECT told the UCE he would explain his absence at a later date.  The SUBJECT then continued:

I will say that your description of Becky is very exciting and has me very turned on.

That said my "weakness " is when things are starting to get hard and sensitive up top and those fine hairs start growing in leading to nicely stained panty liners

The UCE asked if the SUBJECT still wanted to get together and expressed his disappointment at the SUBJECT's lack of communication.  The SUBJECT replied:

> Understood.

> Did mention the scenarios we discussed on the phone with a guy I know here in Anchorage. He was very interested but we are all concerned about Becky being comfortable

34. On November 21, 2017 UCE contacted the SUBJECT by text message. The SUBJECT expressed that he had been thinking about the UCE's daughter a lot and asked about her physical development. He then abruptly stated:

> But to answer your original question, no, I am not the guy who will be meeting up with anyone for anything like this.

> Subject matter is intriguing, and I think about it constantly, but in this day age it's a mine field and that's a step I won't take.

35. The UCE had no contact with the SUBJECT until February 8, 2018. The UCE then sent the following message to the SUBJECT:

Thu, Feb 8, 10:09 AM

> I expected to hear from you already

The SUBJECT replied:

Becky has been on my mind

How is she doing?

The SUBJECT then requested to speak to the UCE on the phone. Shortly thereafter, a UCE placed a phone call to the SUBJECT. The UCE and SUBJECT discussed meeting to sexually molest the UCE's daughter. The SUBJECT expressed reservations due to the possibility of getting caught by law enforcement. Subsequent to the phone call, the following text message conversation occurred:

Sounds like your very turned on. I am also

How does the crotch of her panties look on the morning?

The liner should be getting very wet about now....let's us know her body is ready for action

And how is her chest coming along?

I am really hard now thinking about it

She has stains in her panties

Any hair starting to grow in the slit?

Very fine hair. Have to look close but it's there

Very nice, makes you a great "good night" kiss

Yeah. I don't mind getting in close

I think about giving her a warm full body shower then close chest and slit inspection

I know you would enjoy watching and she would like the feeling

What are the requirements to pass your "inspection"?

Sensitivity to the touch, her clit getting hard, her cunt hole twitching when fingered, and her nipples starting to swell and go erect.

While you watch of course

I think she will pass 😊

You did mention she like to suck cock, right?

Yes she does. She likes to please

What does she think of the taste and texture of cum? Little sluts have to learn to enjoy cum

Do you think your cock will fit in her mouth?

She will take the cum

Need picture to be sure on the size

I am 7 inches and average thickness

I am sure she can take that

Only fair, I will swallow her orgasm cum in return

You will love the taste

Do her nipples swell up and get erect yet when you lick them?

Yes. They are still small but get real hard

Rock hard here!!!

Then her panties will be more than stained soon, they will be DRENCHED in her wetness

Same here. Might have to go pick her up from school early

Very hot

When I meet her, think a vibrator might be a good 🎁

She would appreciate a new toy

And I would love to see you use it on her

Does she take her toy deep in her little cunt?

Or just rub her clit

She likes both

Very nice

## IDENTIFICATION OF THE SUBJECT PHONE

36.  On April 27, 2017 an administrative subpoena was issued to AT&T for subscriber information for the phone number 907-723-1334. On April 28, 2017 and email was received from AT&T indicating that the subscriber for the number was Dennis H Weston, 13431 Baywind Drive, Anchorage, Alaska. The service originated on February 6, 2012.

37.  On February 28, 2018 another administrative subpoena was issued to AT&T for the subscriber information for the same number, 907-723-1334. The information returned again indicated that the subscriber was Dennis H Weston, 13431 Baywind Drive, Anchorage, Alaska with a service origination date of February 6, 2012.

38.  A search of the Alaska Department of Labor indicated that Weston was employed by the State of Alaska Department of Administration. A check of the Alaska Department of Motor Vehicles database revealed that Weston listed his title with the state of Alaska as Division Operations Manager. According to the

Alaska Department of Health and Social Services Office of the Commissioner, Weston was listed as the Deputy Director of Operations of the Alaska Juvenile Justice System.

39. On February 5, 2018, Weston appeared by chance for jury duty in federal district court, District of Alaska. During questioning Weston revealed that he was the Deputy Director of Operations for the Alaska Juvenile Justice System and had been the Superintendent of the Anchorage, Kenai, MatSu Valley and Juneau juvenile detention facilities during the course of his career with the State of Alaska. He has also volunteered his time with Covenant House, a non-profit organization that assists youth who are homeless, at-risk, and/or victims of sex trafficking. Weston was not selected for jury duty.

### Search of the Residence of Dennis Weston

40. On June 26, 2018 a search warrant was executed at the residence of Dennis Weston. Pursuant to the warrant an iPhone was seized from Weston. During the search Weston told FBI agents that he was not issued a phone through his employer. That same day agents spoke to an employee at the McLaughlin Youth Center who knew Weston. The employee informed agents that Weston was issued an iPhone by the Department of Juvenile Justice and that it was located in his office. Later that day employees of the Alaska Health and Social Services Security Office located at the McLaughlin Youth Center took custody of the aforementioned iPhone and the hard drive from the desktop computer located in Weston's office. The back of the iPhone was marked with the International Mobile Equipment

Identity (IMEI) 359305064431893.  The hard drive was manufactured by Seagate
and identified by the serial number W765SX82.

## Mobile Devices

41.   In my training and experience, I know that individuals who use smart
phones, tablets, and other portable devices may back those devices up to the cloud
or to a computer.  Back-ups can be useful in the event that a user loses the data
from their portable device.  By maintaining a back-up copy of the data from their
portable device, a user who has lost the data from his portable device is able to
restore much of what may have previously been on the system.  Back-ups to the
cloud may occur automatically, or may be initiated by the user.  These back-ups
are maintained on servers operated by the cloud hosting service.  For instance,
Apple users may choose to back up their iOS devices to servers maintained by
Apple.  For back-ups to a computer, this process can be accomplished through
connection of the portable device to the computer through a USB, Firewire, or
other similar type of port.  Once connected, the digital device may back up
automatically, or may require the user to initiate the process.  Once completed,
depending upon the settings chosen by the user, a partial or complete copy of the
data present on the portable device will be saved onto the computer.  Whether
back-up to the cloud or to a computer, stored material will generally remain
unchanged unless manipulated by the user in some way, or until overwritten
during a subsequent back-up.

42.     In my training and experience, I know that if an communicates by text message on a smartphone or tablet, and they sync or back up their device to a computer, the messages and history may be backed up and stored on the computer even if the individual later deletes them from the device.

## SPECIFIC METHODS OF SEARCHING FOR DIGITAL EVIDENCE

43.     I am seeking authority to search for, among other things, items containing digital data, more particularly described in Attachment B.  Consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

44.     The search of a smart phone, computer hard drive, or other computer storage medium is a time-consuming manual process often requiring months of work.  This is so for a number of reasons, including the complexity of computer systems, the multiple devices upon which computing can take place, and the tremendous storage capacity of modern day computers, and the use of encryption or wiping software.  As explained above, modern day computers and storage devices are capable of holding massive quantities of child pornography, and the volume of evidence seized in these cases can be immense.  I am aware of cases in which individuals have possessed

thousands of images of child pornography on their computer, multiple computers

and hard drives, or dozens of storage media upon which contraband images were

found. I know from my training and experience, and from my discussions with

trained computer forensic examiners, that a review of such quantities of evidence

can take a significant amount of time. Second, there is a limited pool of personnel

capable of conducting a forensic examination. Third, in some instances an

individual may utilize encryption software or other publically-available techniques

such as wiping software to hide their collections of child pornography. Forensic

tools are available to circumvent some of these techniques; however, these tools may

require a significant allocation of resources and a substantial period of time.

45.     Some or all of the following search methods may be used to conduct the

forensic search in this case. These methods are not listed in any particular order,

nor are their listings in this affidavit a representation that they will be used in this

or any other case. Moreover, this list simply provides an example of techniques that

may be used, and is not intended to bind the forensic examiner to only these

techniques:

> a.     *Keyword Searches*: I know that computer forensic utilities
>
> provide the capability for a user to search for specific key words that
>
> may exist on a piece of digital media. I intend to use specific
>
> keywords known to be related to either the subject's illicit internet
>
> activities or child pornography. As it concerns child pornography,
>
> examples of such keywords include, but are not limited to "preteen,"

"hussyfan," and "r@ygold." Those keyword searches will indicate files and other areas of the hard drive that need to be further reviewed to determine if those areas contain relevant data. A list of keywords utilized will be maintained with the records of the forensic examination.

b. *Data Carving*: I know that, as previously mentioned, data residue may be left in the "free," "unallocated," or "slack" space of a computer hard drive, that is, the space not currently used by active files. I further know that, as previously mentioned, many operating systems utilize temporary storage often referred to as "swap space" on the hard drive to store contents from main system memory. Such unallocated and swap space may contain the residue of files that can be carved out, often in an automated or semi-automated fashion. I intend to use forensic tools to carve out files, in particular, image files such as JPEG and GIF files. The mere act of carving out such files does not expose me to the contents of such recovered files, but makes those files available for further relevancy checks, such as keyword searches (explained above) and hash value comparisons (explained below).

c. *Hash Value Comparisons*: I know that computer forensic utilities provide the capability to utilize a function known as a hash algorithm. A hash algorithm uses a mathematical formula to analyze

the data composing a file, and to generate a unique "fingerprint" for that file. The act of hashing a piece of data does not reveal to an investigator any information about the contents of that data. However, I know that computer forensic applications often contain databases of known hash values for files. Some of those files are "ignorable," which enables other forensic processes to ignore files (such as the Windows operating system) that are not evidentiary in nature. Some of the files are "alert" files, such as the Child Victim Identification Program (CVIP) hash set that contains hash values for a small subset of the identified picture and video files for known victims of child pornography. CVIP alert files notify an examiner that a file appears to contain known depictions of child pornography. I seek permission to utilize automated hash value comparisons to both exclude irrelevant files, and to locate known child pornography files. Hash value comparisons are useful, but not definitive, as even a single-bit change to a file will alter the hash value for the file. The forensic review team does not intend to rely solely on hash value comparisons, but intends to utilize them in order to assist with identifying relevant evidence. The use of this search method is intended to narrow the search. A search of known hash values, however, will not be used exclusively because I know that when previously identified images of child pornography are found on a

target's computer, typically there are many more images of child pornography with unknown hash values. Using a hash value search method exclusively would not uncover these images as well as other evidence authorized by this warrant and described in Attachment B.

d.    *Opening Container Files, Encrypted Volumes, and Embedded Files*: I know that relevant data may be compressed, encrypted, or otherwise embedded in other files or volumes. It is often not possible through any automated process to examine the contents of such containers without opening them, just as it is not possible to examine the contents of a locked safe without first opening the safe. In the event that compressed, encrypted, or otherwise embedded files or volumes may exist on the seized items, I intend to use sophisticated forensic tools to attempt to open any such container files that may reasonably contain evidence of child pornography.

e.    *File Header / Extension Checks*: I know that individuals involved in illegal activities on a computer often change the extension of a file (such as .jpg) to some other incompatible extension (such as .txt) in order to disguise files from casual observers. The extension of a file, however, is not necessarily linked to the "header" of a file, which is a unique marking imbedded automatically in many types of files. By comparing the extension of a file with the "header information" of a file, it is possible to detect attempts to disguise

evidence of illegal activities. Such a comparison can be made in an automated process by computer forensic tools. I intend to run an automated header comparison to detect such efforts, and intend to review any such files that reasonably may contain evidence of child pornography.

f.    *Thumbnail / Image Views*: Although hash value comparisons can positively identify known child pornography depictions, a negative hash value comparison does not exclude an image from suspicion. There is no known alternative for visually inspecting each image file. I therefore intend to examine at least a thumbnail image of each image file on the digital media whether "live," "data carved," or identified by header.

g.    *Registry / Log File Checks*: I know that it is necessary in any criminal case to establish not only that a crime has occurred, but also to establish what person committed that crime. Operating systems and computer programs often maintain various administrative files such as logs that contain information about user activities at certain times. In the Windows operating system, for example, some of these files are collectively referred to as "the registry". Such files contain specific information about users, often including e-mail addresses used, passwords stored, and programs executed by a particular user. These files may also contain evidence regarding storage devices that

have been connected to a computer at some time. Multiple backup copies of such files may exist on a single computer. I intend to examine these files to attempt to establish the identity of any user involved in the receipt, possession, distribution, and transportation of child pornography, and to establish methods (such as software used) and dates of this activity.

h. *Metadata / Alternative Data Streams*: I know that many file types, operating systems, and file systems have mechanisms for storing information that is not immediately visible to the end user without some effort. Metadata, for example, is data contained in a file that is not usually associated with the content of a file, but is often associated with the properties of the application or device that created that file. For example, a digital camera photograph often has hidden data that contains information identifying the camera that manufactured it, and the date the image was taken. Some file systems for computers also permit the storage of alternate data streams, whereby a file such as a text file may hide an image file that would not be immediately visible to an end user without some action taken. I know that both metadata and alternative data streams may contain information that may be relevant to child pornography offenses. Metadata and alternative data streams are often identified and processed automatically by computer forensic utilities. I intend

to review any such data that is flagged by any process above as being relevant to the receipt, possession, distribution, and transportation of child pornography.

46.     With rare exception, the above-listed search techniques will not be performed on original digital evidence. Instead, I know that the first priority of a digital evidence forensic examination is the preservation of all data seized. As such, original digital media will be, wherever possible, copied, or "imaged," prior to the start of any search for evidence. The copy will be authenticated digitally as described in the paragraph below.

47.     I know that a digital forensic image is the best possible copy that can be obtained for a piece of digital media. Forensic imaging tools make an exact copy of every accessible piece of data on the original digital media. In general, the data contained on the original media is run through a hashing algorithm as described above, and a hash value for the entire device is generated. Upon completion of the imaging process, the same hash algorithm is run on the imaged copy to insure the copy is an exact duplicate of the original.

48.     Criminal Procedure Rule 41 specifically states "The officer may retain a copy of the electronically stored information that was seized or copied." Fed. R. Crim. P. 41 (f)(1)(B). Moreover, upon identification of contraband, the item is subject to forfeiture, and the owner has a reduced expectation of privacy in those seized devices. Consequently, should a seized device be found during the authorized forensic review to contain child pornography, it will be retained by the United

States, and may be searched without further authorization of the Court for the evidence described in Attachment B. Such a later search may be required for the following reasons:

  a. Should the execution of the warrant uncover data that may later need to be introduced into evidence during a trial or other proceeding, the authenticity and the integrity of the evidence and the government's forensic methodology may be contested issues. Retaining copies of seized storage media may be required to prove these facts.

  b. Returning the original storage medium to its owner will not allow for the preservation of that evidence. Even routine use may forever change the data it contains, alter system access times, or eliminate data stored on it.

  c. Because the investigation is not yet complete, it is not possible to predict all possible defendants against whom evidence found on the storage medium might be used. That evidence might be used against persons who have no possessory interest in the storage media, or against persons yet unknown. Those defendants might be entitled to a copy of the complete storage media in discovery. Retention of a complete image assures that it will be available to all parties, including those known now and those later identified.

d. The act of destroying or returning storage medium could create an opportunity for a defendant to claim, falsely, that the destroyed or returned storage medium contained evidence favorable to him. Maintaining a copy of the storage medium would permit the government, through an additional warrant if necessary, to investigate such a claim.

e. Similarly, should a defendant suggest an explanation for the presence of evidence on storage medium or some defense, it may be necessary to investigate such an explanation or defense by, among other things, re-examining the storage medium with that explanation or defense in mind. This may require an additional examination of the storage medium for evidence that is described in Attachment B but was not properly identified and segregated previously.

49. In the event that a piece of digital media is found not to be (a) an instrumentality of the offense, (b) a fruit of the criminal activity, (c) contraband, or (d) evidence of the offenses specified herein, it will be returned as quickly as possible.

## CONCLUSION

50. Based upon the information above, your affiant submits that there is probable cause to believe that violations of Title 18, United States Code, Sections 2422, have been committed, and that the items described in Attachment B contain evidence, fruits, and instrumentalities of those violations and that the items

described in Attachment B are likely to be found at the premises described in
Attachment A.

51.     I request that the Court issue a warrant authorizing a search of the
SUBJECT PREMISES that is described in Attachment A, for the items described in
Attachment B.

Signature Redacted

DARYL ALLISON
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
this *19* day of July 2018

/S/ BERNARD ZIMMERMAN
U.S. MAGISTRATE JUDGE
SIGNATURE REDACTED

DEBORAH M. SMITH
Chief United States Magistrate Judge
District of Alaska
Anchorage, Alaska